Filed 5/14/24  Petties v. Ackerman CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| AKISHA PETTIES,<br><br>Respondent,<br><br>v.<br><br>ANDREW ACKERMAN,<br><br>Appellant. | B328526<br><br>(Los Angeles County<br>Super. Ct. No.<br>22CHRO01914) |

　　　　APPEAL from orders of the Superior Court of Los Angeles County, Laura Streimer, Commissioner.  Affirmed.

　　　　Law Offices of Christian Contreras and Christian Contreras for Appellant.

　　　　Akisha Petties, in pro. per., for Respondent.

_____

Appellant Andrew Ackerman appeals from an order denying a motion to quash service of process and a restraining order under the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.) for the protection of his former girlfriend, respondent Akisha Petties. Ackerman, who is a resident of Texas, contends that the trial court lacked personal jurisdiction over him and the order constitutes a prior restraint on speech. We conclude the appellate record is inadequate for review because it does not contain a reporter's transcript of the initial hearing on Ackerman's motion to quash service of process at which the trial court heard evidence from the parties. Even were we to find the record adequate for review, however, it contains ample evidence supporting the trial court's finding of personal jurisdiction. The order does not violate Ackerman's constitutional free speech rights, and therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Request for DVRO

On October 12, 2022, Petties filed a request for a domestic violence restraining order (DVRO) against former boyfriend Ackerman. She provided a mailing address in Austin, Texas. She alleged Ackerman harassed her online for 11 months using different accounts, created a website about her, posted pictures of her without her consent, contacted her friends and followers to lure them to his website, and continued to make disparaging comments to her and about her on social media platforms. Ackerman's comments were causing her anxiety and fear that

2

she would be viewed negatively by her employers, inhibiting her ability to secure work in her field.

That day, the trial court granted a temporary restraining order. Ackerman's address was listed in Plano, Texas. Ackerman was ordered to stay at least 100 yards from Petties, her home, her job, and her car.

## Motion to Quash Service of Process

Ackerman filed a motion to quash service of process. He asserted that there was no basis for California to exercise personal jurisdiction over him, as he is a Texas resident, has no contacts with California, did not take any actions targeted at California, and had not purposefully availed himself of the forum.

Ackerman submitted his declaration in support of the motion to quash. For the past eight years, he has been a resident of Texas. He has never been a resident of California and has no assets in California. He met Petties in 2015 in Texas, and all of their interactions in person were in Texas. Petties attended high school in Texas. She travels frequently, so Ackerman was not certain where she was physically located when they communicated.

A hearing was held on the motion to quash on December 20, 2022. No reporter's transcript of the hearing has been made part of the appellate record. Petties represented herself and Ackerman was represented by counsel. At a subsequent hearing, the court mentioned Ackerman's testimony was taken on December 20, 2022, and there was testimony that Petties lived in California when the parties' relationship ended. The trial court continued the motion to quash to January 4, 2023.

On December 30, 2022, Petties filed a request for temporary emergency orders specifying the conduct that she wanted to cease and providing evidence to support finding minimum contacts with California.

On January 4, 2023, the trial court held a hearing on the motion to quash and the ex parte application. The court ultimately sustained objections to the documentary evidence presented in the ex parte application.

Petties testified that Ackerman was ruining her reputation and her business as an entertainment professional. After the prior court hearing, Ackerman registered her name as a domain and added her followers to another fake Instagram web page luring them to the website. His comments suggest that she doesn't believe in doctors, is a gold digger, has sugar daddies, and has sexually transmitted diseases. Many people have asked her about the social media pages. Petties is adversely affected emotionally, and her reputation has been adversely affected.

Petties also testified that Ackerman sent her multiple, repetitive harassing texts saying he cannot stop himself. She asked him multiple times to stop contacting her. He has impersonated her by creating fake web pages in her name and amassed a network of her friends and followers. He told her to stop blocking contact with him or he would continue creating accounts and posting in her name and about her.

The trial court found that the alleged harassing texts and conduct directed at Petties through the internet, including exposing her image and threatening to defame her, were targeted at her in California. It was conduct that would indisputably disturb her peace of mind within the meaning of the DVPA and could be the basis for a restraining order. The court found there

4

was personal jurisdiction to hear the matter in the California court and denied the motion to quash service.

## Trial

A trial was held on January 25 and March 8, 2023. Petties testified that she and Ackerman dated off and on after meeting in 2015. She moved to California in October 2020. They became engaged in January 2021, but could not agree whether Ackerman would move to California or Petties would move back to Texas. Petties broke off the relationship in February 2021. In September 2021, Petties married another individual.

In December 2021, a female friend received a comment on her TikTok account from an account under the name Beige Active, which is a variation of the name of Petties' business. The comment implied Petties and her friend were in an intimate relationship. Ackerman later admitted writing the comment. Petties described several additional negative comments that Ackerman posted under various account names on her Instagram page and her friends' pages about her.

In January 2022, Petties sent Ackerman a text asking him to stop stalking her online and to leave her alone or she would obtain a restraining order. He claimed that he was not stalking her, but simply viewing and commenting on her public page. When Petties blocked his account, he created a new anonymous account and left additional comments.

On January 24, 2022, Petties posted a photo on her Instagram account with the caption "Angles," referring to modeling angles. Ackerman sent a direct message to Petties from an Instagram account with the username Good.People.Don't.Lie

that said, "If you ever think you're not a bad person, it's a lie. Liars lie to themselves the most. You should never associate yourself with the word 'angel.'" He also left a public comment on her photo from Good. People.Don't.Lie2 referring to plastic surgery. Petties felt very disturbed that he was still contacting her, and plastic surgery was not information that she wanted to be made public. She felt violated and extremely embarrassed, because her followers would see her personal information. She had recently won a competition at an international model and talent association. As a result, she had several new followers. She was extremely embarrassed for her new followers, many of whom were young girls, to see his comments.

Petties texted him privately to tell him that he was harassing her and to ask what he hoped to achieve by continuing to post on her pictures. He responded in pertinent part, "I want you to accept that every time you look into [the] mirror you see a bad person and every time you look into a camera that everyone back is looking at a bad person." Petties did not respond.

In September 2022, Petties contacted the police and provided screenshots of the accounts and comments. The case was sent to law enforcement in Texas.

Later that month, Ackerman purchased the domain name www.akisha-petties.com and created a public website. The website states at the top, "Get to know Akisha Petties." Ackerman described their relationship and posted private pictures that she had sent him without her permission. He accused her of receiving payments for sex. He insinuated that she had a sexually transmitted disease and issues with drug use.

Petties' TikTok page is under the account name AK723. In October 2022, Ackerman used an account named AK.lies to make

comments about Petties on her friend's TikTok page.  When the friend deleted the comments, Ackerman used a new account AK.is.lying to leave more comments about Petties.  On the AK.lies page, Ackerman posted a video of her with the caption, "The face of a liar @AK723," tagging Petties to obtain her attention.

In November 2022, Petties saw an Instagram account that Ackerman created with the username not.Akisha.Petties and six photos of Petties.  Some of the photos were from her public social media accounts.  He added her coworkers, friends, and family members.  Among other comments, he posted, "Pic 1 real; pic 2 implants and filler.  Outside is now as fake as inside."  Ackerman admitted that he made the account.  Some of the photos of Petties posted on the account were pictures that only Ackerman had.

In December 2022, Petties discovered an Instagram account Ackerman created under the username akisha.petties.and.me.  He posted a photo of them to the account in December 2022 that no one else had.  He wrote "Check the link and bio for more" and used a hyperlink to direct people to the website that he created, www.akisha-petties.com.  He followed Pettis' followers, including her employers, coworkers, and her agent.

In addition, in December 2022, after the restraining order was entered, Ackerman posted "Akisha is a lying whore" on the website www.akisha-petties.com.

Ackerman used a variation of the name of Petties' business for his YouTube channel.  He posted innocuous videos of her with comments advising people to go to the Instagram page akisha.petties.and.me and to the website.

Petties felt compelled to set her social media accounts to private, which limits her ability to reach new followers and generate interest in her posts as a model and a singer.

Ackerman testified that he bought airline tickets in December 2020 for Petties to fly from California to Texas for a Valentine's weekend in February 2021. He believed she lied to him about not being able to come see him because she was sick.

Ackerman stated that he created the website www.akisha-petties.com because he learned Petties wanted to be a role model for young actresses, and social media has a negative influence on young women, so he felt it was necessary to let people know who Petties really was.

He has not created additional Instagram accounts or posted additional comments because one account is sufficient to direct people to the website so they have accurate information about who Akisha Petties really is. Although Petties tried to have the Instagram account removed, Instagram reinstated the account after Ackerman provided additional information showing that he was not violating Instagram's terms of service.

**Trial Court Ruling**

On March 8, 2023, the trial court issued its ruling. The court stated that between December 2021 and December 2022, Ackerman created at least seven accounts on various social media platforms about Petties that included her name or initials in the account name. "Though he may not have been outright impersonating [Petties] so much as journalling his own unhappy experiences with her, the use and dissemination of her name and images disturbed her peace. [¶] These accounts further implied

8

or accused her of having an STD and men paid her for sex. He labeled her as a liar, suggested she was gay, and referred to her enlistment of [sugar] daddies."

Ackerman's conduct distressed Petties. She spent considerable time monitoring the internet for his activities, speaking with law enforcement, speaking with administrators of social media sites, speaking with her employer when Ackerman's conduct had an impact on her at work, and ultimately filing the request for a restraining order. She is depressed and anxious as a result of Ackerman's conduct. Ackerman's attempts to malign and defame Petties have interfered with her ability to promote herself in an industry where social media acts as a professional resume. She has had to set her accounts to private, which limits people that she can connect with to those that she has specifically invited to her page.

The trial court found Petties was not the kind of public figure that could or should expect criticism or abuse by followers. She was just getting started in the entertainment industry. Ackerman's communications were very focused and directed at Petties. His conduct arose from their prior domestic relationship and that he believes he is entitled to the return of gifts or money. His communications were intended to bully Petties, tarnish her image, and interfere with her ability to move forward in her life.

"The court finds that [Ackerman's] conduct is deplorable, perhaps motivated by the fact that the relationship ended or that he believes she owed him money or things. He is engaged in harassing outreach designed to interfere with [Petties'] goal and her life. The comments and posts are belittling and potentially defamatory and slanderous. He has reached out to her followers to spread what he thinks is critical messaging about her. Those

9

followers included her employers, her coworkers, an agent, her acting coach. She has been so embarrassed by his conduct that she has considered not reporting to work. [¶] The court finds that whether she is overly sensitive or not, [Ackerman's] conduct will disturb the peace of any reasonable person." The court concluded that Petties was entitled to immediate relief.

The court added, "And I finally just want to say a word about direct communications. While the bulk of [Ackerman's] conduct has taken place on the internet behind the safety of his computer out of the state of California, there have been direct communications long after she testified she'd asked him to leave her alone. The court saw a text in June of 2022, in which she very specifically advised [Ackerman] to stop communicating with her or about her, that the following month he posted a photo of her on a hiking trail on the 'Akisha Petties_' site. [¶] In sum, the court finds [Ackerman's] relentless conduct, which includes the creation of sites using [Petties'] name and images without her consent along with the kind of running commentary that [Petties] fears will tarnish her reputation, to be exactly the kind of conduct that the Domestic Violence Protection Act was designed to protect victims from enduring. [¶] This conduct was intended to hurt her, to get back at her, and to destroy her reputation. It's also clear to the court that the conduct only stopped because the court issued a temporary restraining order. . . . Further, the court doesn't believe that he will leave her alone absent a restraining order. He was still in contact with her and posting about her many months after the relationship ended." The court found Petties met her burden by a preponderance of the evidence and granted the request for a restraining order.

The court issued a restraining order for two years. Ackerman is not to have any contact with Petties in any form, whether direct, indirect, through social media, through her friends, through her employer, or through anyone. The court directed him to move his life forward as if Petties did not exist. The court also instructed him to stay 100 yards away from her, her home, her job, and her car. The court admonished Ackerman not to try to violate the order through a workaround, and ordered that he was not to comment on Petties' social media platforms about her or to her under his own or any other name. The court ordered him to remove all sites on the internet that included her name and/or image. The court explained that he was free to engage on social media, but that he could not post any images of Petties, use her name, or post content about her.

The trial court entered a restraining order that same day. Ackerman filed a timely notice of appeal.

## DISCUSSION

### Personal Jurisdiction

Ackerman contends there is no substantial evidence to support the trial court's finding of personal jurisdiction. We conclude that the record is inadequate for appellate review of this issue, but even on the limited record presented, there is clearly substantial evidence to support the trial court's findings.

11

## A. General Principles

California courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The federal Constitution permits a state to exercise personal jurisdiction over an out-of-state defendant "if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate " ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444.) Personal jurisdiction may be general or specific. (*Thomson v. Anderson* (2003) 113 Cal.App.4th 258, 265–266 (*Thomson*).) The sole issue in this case is whether Ackerman is subject to specific jurisdiction.

A defendant may be subject to specific jurisdiction when (1) the defendant has purposefully availed himself or herself of forum benefits; (2) the controversy at issue arises from or is related to the defendant's forum-related contact; and (3) assertion of jurisdiction comports with fair play and substantial justice. (*Thomson, supra*, 113 Cal.App.4th at p. 265; *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*).)

## B. Relevant Case Law Illustrating Purposeful Availment

The first step of the jurisdiction inquiry depends on the nature of the claim. (*Casey v. Hill* (2022) 78 Cal.App.5th 1143, 1170 (*Casey*).) In tort claims, courts use a " ' "purposeful direction" ' " test and consider whether there is evidence that the

12

defendant directed actions at the forum, even if the actions were taken outside of the forum. (*Ibid*.) The purposeful direction test requires evidence of intentional conduct that deliberately targets the forum state along with the defendant's knowledge that the conduct would cause harm in the forum. (*Ibid*.)

It is the defendant's intentional and allegedly tortious conduct directed at the forum that creates the necessary contacts to assert personal jurisdiction. (*Casey, supra*, 78 Cal.App.5th at p. 1171; *Rivelli v. Hemm* (2021) 67 Cal.App.5th 380, 395–396 (*Rivelli*).) "Applying these principles, numerous courts have found the purposeful direction requirement met where the nonresident defendant purposefully sent tortious communications into a forum and thereby injured its residents." (*Casey*, at p. 1171.)

The United States Supreme Court introduced the "effects" test in *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*). In *Calder*, an actress who lived and worked in California filed a libel action in California against a reporter and an editor working in Florida based on an article about her in a nationally-syndicated newspaper. (*Id*. at pp. 784–786.) The defendants moved to quash service on the ground that California lacked personal jurisdiction over them as Florida residents. (*Id*. at pp. 785–786, 789.) The *Calder* court disagreed, concluding the defendants had relied on California sources, wrote an article about the California activities of a California resident, knew the article would have a potentially devastating impact on the plaintiff, and knew the harm from emotional distress and reputational injury would be suffered in California, where the newspaper had its largest circulation. (*Id*. at pp. 788–790.) "In sum, California [was] the focal point both of the story and of the harm suffered. Jurisdiction over [the

13

defendants was] proper in California based on the 'effects' of their Florida conduct in California." (*Id.* at p. 789.) "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." (*Id.* at p. 790.)

In *Walden v. Fiore* (2014) 571 U.S. 277 (*Walden*), the United States Supreme Court explained that the analysis focuses on the relationship among the defendant, the forum, and the litigation. (*Id.* at pp. 283–284.) The defendant's conduct must create contacts with the forum state that are the basis for jurisdiction, not merely contacts with people who reside in the state. (*Id.* at pp. 285–286.) Of course, the defendant's contacts with the forum state may be intertwined with his interactions with the plaintiff, but the defendant's relationship to the plaintiff alone is insufficient for jurisdiction. (*Id.* at p. 286.)

Courts have found no basis to exercise jurisdiction when a defendant did not direct allegedly tortious activity at California, even if the plaintiff experienced injury in California. For example, in *Pavlovich*, *supra*, the California Supreme Court applied the effects test to conclude that a nonresident defendant who merely posted a California plaintiff's proprietary information on a website accessible to the general public did not expressly aim his tortious conduct at or intentionally target California. (*Id.* at pp. 273–279.)

Similarly, in *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8 (*Burdick*), an employee living in Illinois made a public social media post suggesting a group of bloggers had criminal histories. (*Id.* at pp. 14–15.) The bloggers filed an action in California against the employee. (*Id.* at p. 16.) The *Burdick* court concluded that merely posting an allegedly

14

defamatory statement on social media while knowing the plaintiffs were in California, which was the suit-related conduct in that case, did not create a "substantial connection" between the defendant and California. (*Id.* at pp. 25–26.) There was no evidence that the social media page had a California audience through the defendant's social media connections or advertisements on the page. (*Ibid.*) Simply posting on a public social media page, knowing the plaintiff was in California, was insufficient to confer jurisdiction over the defendant.

In contrast, in *Zehia v. Superior Court* (2020) 45 Cal.App.5th 543, 554 (*Zehia*), the court found it had jurisdiction based on limited effects in California. A defendant located in Michigan sent direct messages to a plaintiff in California and created fake messages impersonating the plaintiff, which the defendant sent to a third party in California. (*Id.* at p. 556.) The *Zehia* court found the defendant's messages were targeted exclusively at a California audience (the plaintiff and the third party). The defendant's contacts with California were not random, fortuitous, or attenuated, and did not result from unilateral activities of the plaintiff. (*Id.* at p. 557.) In addition, the alleged reputational injury occurred when the defamatory statements were received by the California residents, which connected the defendant's conduct to California. (*Ibid.*) Based on these factors, the *Zehia* court concluded the defendant's suit-related conduct established a substantial connection with California. (*Id.* at p. 558.) By sending messages and conversations directly to California residents for the alleged purpose of interfering with their relationship and causing reputational injury in California, the court found the defendant purposefully reached beyond his state and into California, such

15

that he should reasonably anticipate being required to respond in a California court.  (*Ibid*.)

Courts have found jurisdiction exists when the plaintiff suffered injury in California and the defendant's alleged tortious conduct directed at California implicated an important interest of the forum as expressed by state statute.  In *Hogue v. Hogue* (2017) 16 Cal.App.5th 833 (*Hogue*), a wife living in California sought a restraining order against her estranged husband living in Georgia.  The husband did not deny sending a video message to her on social media pretending to shoot himself in the mouth.  (*Id*. at p. 838.)  The *Hogue* court concluded that the DVPA reflects California's concern with an exceptional type of conduct that it subjects to special regulation.  (*Id*. at p. 839.)  The court further stated, "The act of purposefully *sending* a video of a mock suicide *to* plaintiff in California (particularly in the context of alleged domestic violence taking place in Georgia) is indisputably conduct that would disturb plaintiff's peace of mind within the meaning of the act and be the basis for granting a restraining order.  [Citations.]  As a result, this was sufficient to vest personal jurisdiction in the courts of this state over defendant to enjoin any further such conduct."  (*Id*. at p. 839.)

## C.  Standard of Review

"The existence of personal jurisdiction will often present a mixed question of law and fact.  [Citation.]  To the extent that there are factual conflicts, the trial court resolves those disputes and the substantial evidence standard governs our review.  [Citation.]  The ultimate question whether jurisdiction is fair and reasonable under all of the circumstances, based on the facts

16

which are undisputed and those resolved by the court in favor of the prevailing party, is a legal determination warranting our independent review.  [Citations.]"  (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.)

### D.  Evidence Supporting Specific Jurisdiction

Ackerman contends there is no substantial evidence to support the trial court's finding of specific jurisdiction.  It is well-settled that the trial court order is presumed to be correct, all inferences and presumptions are drawn in support of the trial court's order, and the appellant must affirmatively show error.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  It is the appellant's burden on appeal to provide a record which overcomes the presumption of correctness.  (*Webman v. Little Co. of Mary Hospital* (1995) 39 Cal.App.4th 592, 595.)  In the present case, Ackerman did not provide a reporter's transcript of the initial hearing on the motion to quash service of process.  This court is unable to review the evidence presented at that hearing and must assume the parties presented evidence from which the trial court properly concluded it could exercise personal jurisdiction over Ackerman.

There is ample evidence in the appellate record that has been provided, however, to support finding that Ackerman is subject to specific jurisdiction in California because he purposefully directed conduct at California to disturb Petties' peace of mind.  The evidence showed Ackerman knew Petties moved to California in October 2020.  He purchased plane tickets for Petties to fly from California to visit him in Texas.  During their relationship, they could not agree whether Ackerman would

move to California or Petties would move back to Texas. He knew she worked and was establishing a career in California.

The suit-related conduct was creating a web site and social media profiles that incorporated Petties' name, and using these accounts to post embarrassing and derogatory information about Petties without her permission. Knowing Petties was a resident of California, his conduct was targeted at California to disturb her peace of mind. By contacting her friends, family, employer, agent, and coworkers to view the embarrassing and derogatory material posted on his accounts, he also targeted several other individuals living in California. His suit-related conduct was directed at a California audience, allowing California to exercise specific jurisdiction over Ackerman in this case. The trial court properly denied the motion to quash service of the complaint.

## Prior Restraint on Speech

Ackerman also contends the restraining order is an improper prior restraint of his right to free speech under the federal constitution. He has not challenged the scope of the trial court's order, as he expressly conceded at oral argument, but rather the court's imposition of any restraint on his speech. We disagree with his analysis. Ackerman's ability to engage in activity that has been determined to constitute abuse is not the type of "speech" that is afforded constitutional protection.

The First Amendment to the United States Constitution provides: " 'Congress shall make no law . . . abridging the freedom of speech . . . .' " "This fundamental right to free speech applies to the states through the Fourteenth Amendment's due process clause." (*Aguilar v. Avis Rent A Car System, Inc.* (1999)

21 Cal.4th 121, 133–134 (plur. opn. of George, C.J.) (*Aguilar*).) " '[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.' [Citation.] 'The term prior restraint is used "to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." [Citation.] . . . . [P]ermanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints.' " (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 886, italics omitted.)

"Although stated in broad terms, the right to free speech is not absolute." (*Aguilar*, *supra*, 21 Cal.4th at p. 134.) Categories of communication to which First Amendment protection does not extend include libelous speech (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147 (*Lemen*)), and words that constitute employment discrimination (*Aguilar*, *supra*, 21 Cal.4th at pp. 134–135, 141–142).

In *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1428 (*Evilsizor*), the appellate court concluded a DVRO prohibiting husband from disseminating the contents of wife's phone was not a prohibited prior restraint on protected speech because husband's conduct constituted "abuse" under the DVPA. (*Ibid.*)

The trial court in the present case, after a contested hearing, found Ackerman's conduct amounted to abuse under the DVPA. As the court noted in *Evilsizor*, "[t]his distinguishes the present case from those in which trial courts enjoined speech *before* a determination was made that the speech was unprotected. For example, in *Evans v. Evans* (2008) 162

19

Cal.App.4th 1157[,] the appellate court reversed the issuance of a *preliminary injunction* that prohibited a party from publishing certain statements about her former husband, because the injunction was overbroad and amounted to an invalid prior restraint *before trial*.  [Citations.]  The *Evans* court emphasized, however, that a court may prohibit a party from repeating statements *determined at trial* to be defamatory, because defamatory statements are not subject to protection under the First Amendment."  (*Evilsizor*, *supra*, 237 Cal.App.4th at p. 1429.)  In the instant case, the trial court entered an order after a contested hearing where it determined Ackerman committed abuse under the DVPA.

As stated in *Evilsizor*, "This approach is consistent with well-settled First Amendment jurisprudence.  '[A]n injunctive order prohibiting the repetition of expression that ha[s] been judicially determined to be unlawful d[oes] not constitute a prohibited prior restraint of speech.'  (*Lemen*, *supra*, 40 Cal.4th at p. 1153.)  For example, following a court trial in *Lemen*, the trial court determined that the defendant had defamed a restaurant and bar, and it entered a permanent injunction prohibiting the defendant from repeating the defamatory statements.  (*Id.* at pp. 1144–1146.)  The Supreme Court held that 'an injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment.'  (*Id.* at p. 1148.) ' "Once specified expressional acts are properly determined to be unprotected by the first amendment, there can be no objection to their subsequent suppression or prosecution." ' (*Id.* at p. 1156.) Likewise in *Aguilar*, *supra*, 21 Cal.4th 121, the Supreme Court

20

held that where there has been a judicial determination that the use of racial epithets constitutes employment discrimination, an injunction prohibiting the continued use of those slurs does not violate the right to freedom of speech and does not amount to a prohibited prior restraint of speech. [Citation.]" (*Evilsizor, supra*, 237 Cal.App.4th at pp. 1429–1430.)

Under the circumstances, the court's protective order does not violate Ackerman's right to free speech.

## DISPOSITION

The order denying the motion to quash and the restraining order are affirmed. Respondent Akisha Petties is awarded her costs on appeal.

NOT TO BE PUBLISHED.

MOOR, Acting, P. J.

We concur:

KIM, J.

LEE, J.⋅*

---

\* Judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.